IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

BECTON DICKINSON AND COMPANY, )
                                    )
             Plaintiff,       )
                                      )
       v.                   )      Civil Action No.  02-1694 GMS
                                      )
TYCO HEALTHCARE GROUP LP,      )
                                      )
           Defendant.     )

## MEMORANDUM

## I.    INTRODUCTION

The plaintiff, Becton, Dickinson and Company ("BD") filed the above-captioned action against Tyco Healthcare Group, LP. ("Tyco") on December 23, 2002, alleging that is infringing U.S. Patent No. 5,348,544 (the "'544 patent"). The '544 patent is generally directed toward single-handed actuated safety shields used to prevent accidental needle sticks to health care workers.

Tyco asserted the defenses of invalidity for anticipation, failure to satisfy the written description requirement under 35 U.S.C. § 112, and inequitable conduct.[1]  The court held a *Markman* hearing and issued an order construing the disputed terms of the '544 patent on November 14, 2003.  A jury trial commenced on October 18, 2004.[2]  During trial, Tyco properly moved for judgment as a matter of law ("JMOL") pursuant to Rule 50(a) of the Federal Rules of Civil procedure.  The court reserved ruling on all JMOL motions.

---

[1] In a Memorandum and Order, dated September 16, 2004, the court found that the '544 patent was not anticipated by the prior art, thereby disposing of Tyco's anticipation defense.

[2] BD's infringement claims and Tyco's written description defense were tried to a jury. Tyco's inequitable conduct defense, however, was tried by the court outside the presence of the jury pursuant to Federal Rule of Civil Procedure 42(b).

On October 26, 2004, the jury returned a unanimous verdict on all claims in favor of BD. The jury found that Tyco infringed the claims of the '544 patent, and that its infringement of the patent was willful.  The jury also upheld the validity of the '544 patent, and awarded BD lost profits damages in the amount of $4,204,423.00, royalty damages in the amount of $236,498.00 for Tyco's infringing Monoject Magellan safety needle devices, and royalty damages of ten cents per unit for Tyco's infringing Monoject Magellan blood collector devices.  The court entered judgment on the verdict on October 26, 2004.

Following the jury's verdict, Tyco filed a renewed motion for judgment as a matter of law, as well as a motion for a new trial or to alter or amend the judgment under Federal Rule of Civil Procedure 59(e).  BD filed a motion for enhanced damages, attorneys' fees, pre-judgment interest and post judgment interest, and a motion for a permanent injunction.  For the following reasons, the court will deny Tyco's motion for JMOL, deny Tyco's motion to reconsider the court's claim construction, and grant Tyco's motion for a new trial.  The court will also deny BD's motions for enhanced damages, attorneys' fees, pre-judgment interest, post judgment interest, and a permanent injunction.

## II.   STANDARDS OF REVIEW

### A.   Renewed Motion for Judgment as a Matter of Law

Pursuant to Federal Rule of Civil Procedure 50, a court may render judgment as a matter of law after the moving party is fully heard on an issue at trial, if "there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue."  *Walter v. Holiday Inns, Inc.*, 985 F.2d 1232, 1238 (3d Cir. 1993) (citation omitted).  If the court denies a motion for JMOL during trial, the motion may be renewed within ten days of entry of judgment in the case.  FED. R.

CIV. P. 50(b).  To prevail on a renewed motion for JMOL following a jury trial, a party "'must show that the jury's findings, presumed or express, are not supported by substantial evidence or, if they were, that the legal conclusion(s) implied [by] the jury's verdict cannot in law be supported by those findings.'"  *Pannu v. Iolab Corp.,* 155 F.3d 1344, 1348 (Fed. Cir. 1998) (quoting *Perkin-Elmer Corp. v. Computervision Corp.*, 732 F.2d 888, 893 (Fed. Cir. 1984)).  "'Substantial' evidence is such relevant evidence from the record taken as a whole as might be accepted by a reasonable mind as adequate to support the finding under review." *Perkin-Elmer Corp.*, 732 F.2d. at 893.  In assessing the sufficiency of the evidence, the court must draw all reasonable inferences from the evidence in the light most favorable to the nonmovant.  *Id.*; *Richardson-Vicks Inc. v. UpJohn Co.*, 122 F.3d 1476, 1479 (Fed. Cir. 1997).  The appropriate inquiry is whether a reasonable jury, given the facts before it, could have arrived at the conclusion it did.  *Dawn Equip. Co. v. Kentucky Farms, Inc.*, 140 F.3d 1009, 1014 (Fed. Cir. 1998).  The court may not determine the credibility of the witnesses nor "substitute its choice for that of the jury between conflicting elements of the evidence." *Perkin-Elmer Corp.*, 732 F.2d at 893.

**B.     Motion for Reconsideration**

As a general rule, motions for reconsideration should be granted only "sparingly." *Tristrata Tech., Inc. v. ICN Pharms., Inc.*, 313 F. Supp. 2d 405, 407 (D. Del. 2004); *Karr v. Castle*, 768 F. Supp. 1087, 1090 (D. Del. 1991).  In this district, these types of motions are granted only if it appears that the court has patently misunderstood a party, has made a decision outside the adversarial issues presented by the parties, or has made an error not of reasoning, but of apprehension. *See, e.g.*, *Shering Corp. v. Amgen, Inc.*, 25 F. Supp. 2d 293, 295 (D. Del. 1998); *Brambles USA, Inc. v. Blocker*, 735 F. Supp. 1239, 1240 (D. Del. 1990) (citing *Above the Belt, Inc.*

*v. Mel Bonhannan Roofing, Inc.*, 99 F.R.D. 99 (E.D. Va. 1983)); *see also Karr*, 768 F. Supp. at 1090 (citing same). Moreover, even if the court has committed one of these errors, there is no need to grant a motion for reconsideration if it would not alter the court's initial decision. *See Pirelli Cable Corp. v. Ciena Corp.*, 988 F. Supp. 424, 455 (D. Del. 1998). Finally, motions for reconsideration "should not be used to rehash arguments already briefed."  *TI Group Automotive Systems, (North America), Inc. v. VDO North America L.L.C.*, 2002 U.S. Dist. LEXIS 1018, 2002 WL 87472 (D. Del. 2002) (citation omitted); *see also Quaker Alloy Casting v. Gulfco Industries, Inc.*, 123 F.R.D. 282, 288 (N.D. Ill. 1988) ("This Court's opinions are not intended as mere first drafts, subject to revision and reconsideration at a litigant's pleasure.").

### C.     Motion for a New Trial

The court may grant a new trial pursuant to Federal Rule of Civil Procedure 59 "for any of the reasons for which new trials have heretofore been granted in actions of law in the courts of the United States." FED. R. CIV. P. 59(a).  In making this determination, the trial judge should consider the overall setting of the trial, the character of the evidence, and the complexity or simplicity of the legal principles which the jury had to apply to the facts.  *Lind v. Schenley Industries, Inc*., 278 F.2d 79, 89 (3d Cir.), *cert. denied*, 364 U.S. 835 (1960).  A court should grant a new trial in a jury case, however, only if "the verdict was against the weight of the evidence . . . [and] a miscarriage of justice would result if the verdict were to stand." *Williamson v. Consolidated Rail Corp.*, 926 F.2d 1344, 1352 (3d Cir. 1991).

## III.   DISCUSSION

### A.   Tyco's Renewed Motion for JMOL of Non-infringement

In the motion presently before the court, Tyco challenges the jury's finding that it infringed the asserted claims of the '544 patent.  A patent infringement analysis entails two steps: "(1) claim construction to determine the scope of the claims, followed by (2) determination of whether the properly construed claim encompasses the accused device." *Bai v. L & L Wings, Inc.*, 160 F.3d 1350, 1353 (Fed. Cir. 1998) (citations omitted).  The first step, claim construction, is a matter of law for the court to decide. *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 372 (1996).  The second step, the determination of infringement, is a question of fact. *Bai*, 160 F.3d at 1353.  A patentee must establish literal infringement by a preponderance of the evidence. *See, e.g.*, *Braun Inc. v. Dynamics Corp.*, 975 F.2d 815, 819 (Fed. Cir. 1992).  "To establish literal infringement, every limitation set forth in a claim must be found in [the] accused product, exactly." *Southwall Tech., Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1575 (Fed. Cir. 1995).  Therefore, the court must determine whether substantial evidence supports the jury's finding that at least one of the limitations in each of the asserted claims is found in Tyco's accused devices, "exactly."

The invention of the '544 patent is a safety needle shield that is used to prevent accidental needle sticks to health care workers.  At trial, BD asserted claims 1 and 24 against Tyco's Monoject Magellan safety needle (the "safety needle device") and Tyco's Monoject Magellan safety blood collector (the "SBC device") (collectively, the "Monoject Magellan devices").  Prior to trial, Tyco stipulated that its safety needle device met every element of Claims 1 and 24, but the "spring means" element.  Tyco further stipulated that its SBC device met every element of claims 1 and 24, but the

5

"spring means" and "guard" elements.  Claim 1[3] of the '544 patent reads:

> 1.  A shieldable needle assembly comprising:
>
> a needle cannula having a proximal end and a distal tip;
>
> a guard having a proximal end, an opposed distal end and a side wall extending therebetween, said guard being slidably movable along said needle cannula from a first position substantially adjacent said proximal end of said needle cannula to a second position where said distal tip of said needle cannula is intermediate said opposed proximal and distal ends of said guard;
>
> a hinged arm having proximal and distal segments articulated to one another for movement between a first position where said segments are substantially collapsed onto one another, said proximal segment of said hinged arm being articulated to a portion of said needle assembly adjacent said proximal end of said needle cannula, said distal segment of said hinged arm being articulated to said guard, said proximal and distal segments of said hinged arm having respective lengths for permitting said guard to move from said first position to said second position on said needle cannula, and for preventing said guard from moving distally beyond said second position; and
>
> spring means connected to said hinged arm for urging said guard along said needle cannula toward said second position.

Based on its review of the evidence, the jury found that Tyco's Monoject Magellan devices infringed claims 1 and 24 of the '544 patent.

Tyco contends that the jury's findings were not supported by substantial evidence.  Specifically, Tyco argues that BD failed to prove that its Monoject Magellan devices infringe the '544 patent;  no reasonable jury could find literal infringement based on BD's evidence, which indicated that the same living hinge of the Monoject Magellan devices had to meet two claim limitations;  BD's evidence at trial established that the "spring means" must be in addition to the living hinges of the hinged arm;  and no reasonable jury could conclude that the SBC device has a guard with a proximal end.  The court will first address Tyco's arguments regarding the "spring

---

[3] Claim 1 and claim 24 both contain the same language regarding the limitations at issue in the present case.  Therefore, the court will use claim 1 as a representative claim.

means" limitation, and then address its arguments regarding the "articulated guard" limitation.[4]

1. Whether a Reasonable Jury Could Find that Tyco's Monoject Magellan Devices Satisfy the "Spring Means" Limitation of the '544 Patent

Tyco first argues that JMOL of non-infringement of claims 1 and 24 is warranted because BD failed to prove that its Monoject Magellan devices contain the "spring means" limitation required by the '544 patent.  As part of this argument, Tyco initially contends that the new infringement theory that BD presented at trial lacks any legal or evidentiary basis. (D.I. 262, at 22-25.)  As a result, Tyco contends that the jury could not properly conclude that there was infringement based on BD's new theory of movement of the guard before unlatching.  (Id. at 25.) Without deciding whether Tyco's position is correct, and because the court will grant Tyco a new trial based on BD's new theory of infringement (see section F), the court will not address these contentions, because they are irrelevant to the task at hand (*i.e.* the court's inquiry as to whether BD presented sufficient evidence from which the jury could find that Tyco's Monoject Magellan devices infringe after they are unlatched).

Tyco argues that BD failed to meet its burden of proof, with respect to its contention that the Monoject Magellan devices infringe because the living hinges cause the guard to move along the cannula toward the needle tip after the guard is unlatched.  That is, Tyco argues that BD did not present evidence that movement toward the tip occurred, and that the living hinges of Tyco's devices cause the movement.  The court disagrees, because the record supports the jury's conclusion that

---

[4] Tyco also contends that it is entitled to JMOL because BD's evidence at trial established that the "spring means" is a means-plus-function limitation.  Because Tyco has asked the court to reconsider an Order, the court will consider the motion as one for reconsideration, not JMOL, and address it in a separate section of this memorandum.

movement toward the needle tip occurred after unlatching.  For example, Richard Ciazza ("Ciazza"), a co-inventor of the '544 patent, testified that the Monoject Magellan devices contained "springs" that give the guard "a little nudge . . . forward."  (Trial Transcript ("Tr.") at 214:9-15.)  Ciazza further testified that the guard on Tyco's safety needle device moves toward the second position upon unlatching the hook. (Id. at 214:12-17.) Lastly, Ciazza explained that the function of the latch was to "hold[] the articulating arms back," because, without it, the arms "would just move, they would want to move forward to their relaxed position, the memory that is in the plastic."  (Id. at 215:4-12.)

BD also adduced evidence from Matthew Vessa ("Vessa"), a senior product engineer, who testified that, after unlatching, the guard on the Monoject Magellan devices moved or "start[ed] peering towards the tip of the needle."  (Tr. at 587:-12-18.)  Vessa also testified that he could see the movement of the guard "just by looking at it"– that is, without the aid of equipment.  (Id. at 587:19-22.)  Based on this evidence, the jury could have reasonably found that the living hinges of Tyco's Monoject Magellan devices caused the guard to move from the first position toward the needle tip.

Moreover, BD adduced evidence in the form of expert testimony regarding the movement of the guard after unlatching.  Dr. Charles A. Garris, Jr. ("Dr. Garris"), BD's infringement expert, examined the Monoject Magellan devices and concluded that they each had a spring element connected to the hinged arm that worked to urge the guard along the needle cannula toward the tip. (Tr. at 835:24-836:7; 841:21-842:2; 848:22-25; 849:5-22.) Dr. Garris testified that the living hinges of the Monoject Magellan devices store energy, and explained that the spring in the devices is "derived from the living hinges."  (Id. at 836:9-837:7; 850:18-23.)  BD also adduced evidence from

8

Dr. Mary C. Boyce ("Dr. Boyce") regarding the movement of the guard after unlatching.  Dr. Boyce testified that she conducted and videotaped experiments, wherein she removed the latch from Tyco's Monoject Magellan devices to determine whether the guard moved after unlatching.  Dr. Boyce explained her experiments and testified that, in some of her experiments, there was "a small bit of movement forward" after she removed the latch.  (Id. at 923:1-924:12.)  Dr. Boyce testified that the movement forward did not demonstrate that Tyco's devices contained a spring that urged the guard forward.  (Id. at 924:22-25.)  However, Dr. Boyce later testified that she could not "conclusively say" whether the movement occurred because she imparted force to the structure, or whether other sources, including the living hinges, caused the movement.  (Id. 970:10-22.)  Dr. Boyce's testimony, therefore, does not undercut the jury's finding of infringement.  As such, the court concludes that BD adduced evidence from which a reasonable jury could have found infringement.

Next, Tyco argues that no reasonable jury could find literal infringement where BD's evidence indicated that the middle hinge of the hinged arms of Tyco's Monoject Magellan devices "met both the 'hinged arm' limitation (in part) and the 'spring means' limitation (in its entirety)." (D.I. 262, at 28.)  Absent from Tyco's briefing, however, is any evidentiary support for its position. In fact, Tyco does nothing more than quote Federal Circuit cases, which hold that the same structure in an accused device cannot meet separate claim limitations, and conclude that BD's trial evidence violates that prohibition.  Contrary to Tyco's assertion however, the record contains evidence demonstrating that living hinges of the Monoject Magellan devices other than the middle hinge of the hinged arm satisfy the "spring means" limitation.  For example, the cutaway view of the safety needle device attached to Dr. Garris' expert statement, and discussed at length during trial, contains an arrow and label indicating that the "spring means" requirement is also met by the living hinge

that attaches the hinged arm to the needle hub.  (D.I. 263, Expert Statement of Dr. Charles A. Garris, Jr., Ex. 5.)  Likewise, the cutaway view of the SBC device contains a similar arrow and label pointing out  that the living hinge connecting the hinged arm to the hub is the "spring means."  (Id. at Ex. 7.)  Given the foregoing, the court concludes that a reasonable jury could find that the Monoject Magellan devices literally infringed the '544 patent, because the evidence does not indicate that the same structure met two different claim limitations.

> 2.      Whether a Reasonable Jury Could Find that Tyco's SBC Device Satisfies the "Guard Limitation" of Claim 1 of the '544 Patent

Tyco argues that JMOL is appropriate as to the SBC device, because "it lacks a guard with a proximal end, and there is no legally sufficient evidentiary basis for a reasonable jury to find otherwise."  (D.I. 262, at 29.)  First, Tyco contends that the claim limitation requires the guard to have two structural ends, and the SBC guard does not have two distinct structural ends.  Tyco further contends that, "the claims call for a guard that is separate from and articulated to the hinged arm and in particular to the distal segment of the hinged arm."  (Id. at 18.)  According to Tyco, the SBC device has no separate guard, because it is the distal segment of the hinged arm that covers the needle tip.  (Id.)  Thus, Tyco contends that the SBC device cannot infringe the '544 patent claims. The court is not persuaded by Tyco's arguments.

With respect to Tyco's first argument, the court concludes that BD adduced evidence at trial from which a reasonable jury could conclude that the guard of the SBC device has two ends. Specifically, Mr. Ferguson ("Ferguson") testified that he could "visually . . . draw[] a boundary" from the "horizontal bar or wall of plastic," and "describe a region [the guard] from that wall forward."  (Tr. at 391:1:25.)  Ferguson also testified that when the SBC is in its latched position,

after use, the needle tip is proximal to the end of the guard, and the wall of plastic captures the bevel and needle tip, protecting the user from a needle stick.  (See Id. at 392:4-15.)  Additionally, BD used one of its admitted exhibits, a technical drawing (PX 96), to show that the SBC device contains a guard with a proximal and distal end.  Ferguson's testimony and BD's exhibit demonstrate that a reasonable jury could conclude that the guard of Tyco's SBC product "is comprised of a proximal end and an opposed distal end, which ends are connected by a sidewall," as required by the claims of the '544 patent.

Furthermore, the court concludes that Tyco's argument that the guard must be separate from and articulated to the distal segment of the hinged arm is misplaced.  The parties stipulated to the definition of the phrase "said proximal segment of said hinged arm being articulated to a portion of said needle assembly adjacent said proximal end of said needle cannula, said distal segment of said hinged arm being articulated to said guard."  (See D.I. 45, at 3.)  Whether the guard must be separate from the hinged arm, under the parties' construction, was a fact question for the jury to decide.  In finding that the SBC device contains a guard that infringed the '544 patent, the jury determined that the guard did not have to be separate from the hinged arm.  In other words, when presented with the evidence from both parties, the jury determined that part of the distal segment of the hinged arm was the guard.  In the present motion, Tyco does not contend that the jury's finding was unsupported by substantial evidence but, rather, disputes the jury's finding.  However, the court has already concluded that BD adduced sufficient evidence from which the jury could find that Tyco's SBC device met the "guard" limitation of the '544 patent.  Therefore, based on the foregoing discussion, the court will deny Tyco's motion for JMOL of non-infringement.

### B.      Tyco's Renewed Motion for JMOL of Willful Infringement

Tyco also has moved for JMOL on the basis that there is no substantial evidence of willful

infringement.  The court need not address Tyco's contentions at this juncture, however, because, as

discussed in section F below, the court will grant Tyco a new trial on infringement.  Thus, whether

or not BD adduced substantial evidence to the jury on the issue of willful infringement is of no

moment, as BD will have to present its willfulness case to a different jury during the course of the

new trial.  Accordingly, the court will deny Tyco's motion.

### C.      Tyco's Renewed Motion for JMOL on Invalidity

Tyco next argues that the '544 Patent is invalid because it does not satisfy the written

description requirement.  Section 112 provides in pertinent part:

> The specification shall contain a written description of the invention,
> and of the manner and process of making and using it, in such full,
> clear, concise, and exact terms as to enable any person skilled in the
> art to which it pertains, or with which it is most nearly connected, to
> make and use the same, and shall set forth the best mode
> contemplated by the inventor of carrying out his invention.

35 U.S.C. § 112.  The statute requires the patentee to provide the public with clear notice of what

activities infringe the patent.  *See Exxon Research & Eng'g Co. v. United States*, 265 F.3d 1371,

1375 (Fed. Cir. 2001); *Morton Int'l v. Cardinal Chem. Co.*, 5 F.3d 1464, 1470 (Fed. Cir. 1993).  The

Federal Circuit has held that the written description requirement mandates an applicant to provide

a description that "reasonably conveys" to one skilled in the art that the inventor was in possession

of what is claimed as of the filing date sought.  *Vas-Cath Inc. v. Mahurkar*, 935 F.2d 1555, 1563

(Fed. Cir. 1991) (citation omitted).  In order to show that one is "in possession," the applicant must

describe the invention, with all of its claimed limitations, and not only that which makes it obvious.

*Lockwood v. Am. Airlines, Inc.*, 107 F.3d 1565, 1572 (Fed. Cir. 1997).  The applicant accomplishes this by using such descriptive means as "words, structures, figures, diagrams, formulas, etc., that fully set forth the claimed invention."  *Id.*  Further, while it is not necessary for the applicant to describe the claimed subject matter in the same terms as used in the claims, "the specification must contain an equivalent description of the claimed subject matter."  *Id.* (citing *Eiselstein v. Frank*, 52 F.3d 1035, 1038 (Fed. Cir. 1995)).  As a patent is presumed valid, the party asserting a defense of invalidity on the basis of claim indefiniteness bears the burden of proof by clear and convincing evidence.  *See Orthokinetics, Inc. v. Safety Travel Chairs, Inc.*, 806 F.2d 1565, 1575-76 (Fed. Cir.1986).

Claim 1 of the patent covers a "spring means connected to said hinged arm for urging said guard along said needle cannula toward said second position."  ('544 Patent col. 7, ll. 33-35.)  According to Tyco, this language does not satisfy the written description requirement because the patent contains no disclosure to support a reading of "spring means" in the form of the living hinges of the hinged arm.  (D.I. 262, at 32.)  Additionally, Tyco contends that the language discloses only spring element 68 and coil spring 90 as performing the function of moving the guard forward.  (Id.)  In this regard, Tyco contends that the inventors were not "in possession" of the invention.  The court is not persuaded.

In its *Markman* Order, the court construed the "spring means" limitation to mean "the hinged arm is connected to a spring that moves the guard along the cannula toward the second position."  (D.I. 77.)  In doing so, the court rejected incorporating the "spring element 68" or "coil spring 90" limitations into the claim.  (See D.I. 214, at 7.)  Thus, Tyco's contention that the '544 patent discloses only spring element 68 and soil spring 90 is inconsistent with the court's ruling, and an

13

improper attempt to reargue claim construction.  Moreover, the specification of the '544 patent is at odds with Tyco's contentions, because it expressly mentions examples of springs contemplated to fall within the scope of the invention, including an "over-center hinge spring 62." ('455 Patent, Col. 6, ll. 38-46.)  Finally, although Tyco's expert, Mr. Elson, testified that the '544 patent discloses only spring element 68 and coil spring 90 as performing the function of moving the guard forward, the jury was free to reject his testimony in light of the court's instructions as to the meaning of the "spring means" limitation, and in light of the disclosure in the specification.  Thus, for all of the reasons discussed, the court has no basis to overturn the jury's verdict that the '544 patent is not invalid for failure to satisfy the written description requirement.

### D.    Tyco's Renewed Motion for JMOL on Damages

Additionally, Tyco contends that no reasonable jury could conclude that BD is entitled to lost profits damages.  To recover for lost profits damages, a patentee must show that there was a reasonable probability that it would have made the sales that the infringer made "but for" the infringement.  *Rite-Hite Corp. v. Kelley Co., Inc.*, 56 F.3d 1538, 1545 (Fed. Cir. 1995).  The Federal Circuit has adopted the four-part lost profits test set forth in *Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.*, 575 F.2d 1152 (6th Cir. 1978).[5]  Under the *Panduit* test, a patentee must establish: "(1) demand for the patented product; (2) absence of acceptable non-infringing substitutes; (3) manufacturing and marketing capability to exploit the demand; and (4) the amount of profit [the patentee] would have made."  *Rite-Hite*, 56 F.3d at 1545 (citation omitted).  In the present motion, the crux of Tyco's argument is that BD failed to (1) establish that demand for the patented product,

---

[5] The *Panduit* test is a non-exclusive method to determine lost profits, and was the only method addressed at trial.

and (2) quantify its lost profits.

Tyco first argues that BD failed to provide substantial evidence to prove that the demand for the SafetyGlide is based on its patented "spring means" feature. This argument is misplaced, however, because the "spring means" is not the only patented feature of the SafetyGlide. That is, the claims of the '544 patent are directed to more than the "spring means" feature, and include the slidably movable guard, as well as the hinged arms. ('544 Patent, claim 1.) Because the patented product includes more than the "spring means," the court rejects Tyco's argument to the extent it only relies on the "spring means" limitation.

Moreover, the court concludes that BD adduced substantial evidence at trial regarding the demand for the patented products. For example, Erica McGovern ("McGovern"), BD's "director for marketing safety injection," testified that "[t]he primary drivers for customer decisions [to purchase the products found in the platform technology that SafetyGlide and the Monoject Magellan products are in] are really the fact that they are needle-based, they are single-handed, and they have that nice folded-in safety feature that's really easy to activate and slides over the needle." (Tr. at 626:4-10; see id. at 601:15-23.) McGovern also testified that the SafetyGlide lost sales after Tyco introduced its Monoject Magellan safety needle device into the market. (Id. at 631:16-633:7.) Lastly, McGovern testified that BD lost part of its market share as a result of Tyco's sales of its infringing safety needle device. (Id. at 634:23-635:24.) McGovern's testimony leads the court to conclude that BD presented substantial evidence showing the demand in the marketplace for the patented features of the SafetyGlide.

Tyco also argues that BD failed to quantify its lost profits because it omitted relevant costs from its lost profits analysis. Tyco points to Robert Oliynik's ("Oliynik's") testimony and contends

that he testified that lost profits could not be determined from BD's standard costs document because it did not reflect salesmen's commissions, marketing costs, advertising costs, or shipping costs. (D.I. 262, at 35.) Tyco further contends that Dr. Stephen Jizmagian ("Dr. Jizmagian") used the standard costs document to compute lost profits, even though it did not contain all of BD's costs. According to Tyco, Dr. Jizmagian's lost profits figure is not supported by the evidence and fails to satisfy the *Panduit* standard. (Id.)

After having reviewed the testimony of Oliynik and Dr. Jizmagian, it is more than clear to the court that the jury's finding that BD quantified its lost profits is supported by substantial evidence. With respect to the standard costs document, Oliynik did testify that certain costs were not included. (Tr. at 658:12-659:17.) However, he also testified that those costs are not built into the standard because they are not allocated to a specific product line. (Id.) Instead, BD manages the costs on a "total business basis," which explains why the costs were not included. (Id. at 659:5-9.) Dr. Jizmagian testified that in order to account for the costs that were not included in the standard costs document, he added a component of costs from 4.1 percent of BD's sales. (Tr. at 707:5-9). According to Dr. Jizmagian, the 4.1 percent included the distribution costs and the sales commissions. (Id. at 707:9-16.) Dr. Jizmagian testified that he arrived at the 4.1 percent from discussions he had with Oliynik regarding BD's distribution costs and sales commissions on a gross company-wide basis. (Id.) Dr. Jizmagian, therefore, explained his reasons for adding the 4.1 percent sales number to his cost calculations. He further explained that adding the 4.1 percent made no difference, because his cost analysis included higher incremental costs than BD had previously incurred. (Id. at 708:18-22.) Thus, BD would receive less profits under his conservative cost analysis than it would received if he had gone into a full incremental cost analysis. (Id. at 709:14-

24.) Given this testimony, the court sees no reason to disturb the jury's lost profits finding and will, therefore, deny Tyco's motion.

      **E.**      **Tyco's Request to Reconsider the Construction of the Term "Spring Means"**

As previously mentioned, Tyco contends that the evidence adduced at trial established that the "spring means" claim term is a means-plus-function term, and that the court's claim construction of "spring means" is incorrect because it is not consistent with the evidence. Specifically, Tyco argues that "the [c]ourt rejected Tyco's argument [in its claim construction Order] that 'spring means' is a means-plus-function limitation, but the [c]ourt should reconsider this ruling in light of BD's evidence at trial." (D.I. 262, at 28.) Tyco further argues that BD convinced the court during claim construction that the "spring means" element had sufficient structure to rebut the presumption that it was a means-plus-function limitation. According to Tyco, BD argued at trial that the "spring" of the "spring means" limitation relates to function and not structure. (Id.) Thus, Tyco concludes that the court should reconsider its claim construction Order in light of the testimony at trial.

In the present case, the court has already addressed the issues presented in Tyco's argument for reconsideration, both at the *Markman* hearing and in its summary judgment opinion. *See Becton Dickinson & Co. v. Tyco Healthcare Group*, No. Civ. A. 02-1694 GMS, 2004 WL 2075413, at *4 (D. Del. Sept. 16, 2004). Put more simply, Tyco's post-trial briefing rehashes arguments that the court has already considered and rejected. Thus, none of the procedural grounds for granting reconsideration exist.[6]

---

[6] A further reason to deny Tyco's request for reconsideration is that it is untimely. Rule 7.1.5 of the Local Rules of Civil Practice and Procedure for the District of Delaware provides that "a motion for re-argument shall be served and filed within 10 days after the filing of the Court's opinion or decision." D. Del. L.R. 7.1.5. Other courts in this district have applied this rule to deny motions for reconsideration of claim construction orders filed more than 10 days

**F.      Tyco's Motion for a New Trial**

Tyco alternatively contends that the court should set aside the judgment and grant a new trial because it was unfairly surprised and prejudiced by BD's new infringement theory at trial – its theory that Tyco's Monoject Magellan devices move prior to unlatching and, therefore, infringe the '544 patent.  Tyco also  contends that the court should grant a new trial because it erred in its evidentiary rulings relating to BD's new infringement theory.

Tyco first contends that it is entitled to a new trial as to infringement, and the related issues of willfulness and damages, because "this was a classic case of trial by ambush." (D.I. 261, at 3.) That is, Tyco contends that at all times prior to trial, including in its claim charts, its expert reports regarding infringement, and its motion for summary judgment of infringement, BD asserted that Tyco's Monoject Magellan devices met the "spring means" limitation of the '544 patent because the living hinges of their hinged arms act as springs, moving the guard toward the needle cannula after the hinged arms are unlatched.  (Id.)  Tyco further contends that, during the trial, BD for the first time abandoned the "after unlatching" theory of infringement and began asserting that Tyco's Monoject Magellan devices infringed because their living hinges moved the guard toward the needle cannula before the hinged arms are unlatched.  (Id.)  According to Tyco, because BD changed its infringement theory during the trial from "after unlatching" to "pre-unlatching," it was unfairly

---

after the court's *Markman* opinion.  *See IPPV Enters., LLC v. Echostar Commc'ns Corp.*, No. Civ. A. 99-577-KAJ, 2003 WL 723260, at * 9 (D. Del. Feb. 27, 2003) (denying motion to reconsider claim construction when it was filed more than ten days after the court filed its decision); *Moore N. Am., Inc. v. Poser Business Forms, Inc.*, No. Civ. A. 97-712-SLR, 2001 WL 253113, at *1 (D. Del. Mar. 7, 2001) (same).  Here, the court issued its *Markman* Order (D.I. 77) construing the disputed "spring means" term on November 14, 2003.  Tyco did not attempt to seek reconsideration of the ruling at any time prior to, or during, trial.  As such, Tyco's motion is untimely.

surprised, unable to properly respond to the theory and, therefore, clearly prejudiced.

"Surprise during trial, by major variance in theory of recovery or defense, undisclosed until after the trial is underway, is a long-established ground for granting a new trial motion." *Sanford v. Crittenden Memorial Hosp.*, 141 F.3d 882, 886 (8th Cir. 1998). The Federal Rules of Civil Procedure were adopted, in part, to eliminate the element of "surprise" in litigation. Indeed, the Rules exist to "insure that causes [are] fully and fairly litigated by parties to the action from the outset." *Twigg v. Norton Co.*, 894 F.2d 672, 675 (4th Cir. 1990) (citing 8 Wright & Miller, *Federal Practice and Procedure* § 2001.) "In pretrial procedure, made effective through a precedent broad discovery practice, lies the best answer yet devised for destroying surprise and maneuver as twin allies of the sporting theory of justice. . . . Pretrial discovery and pretrial conference procedures can truly be employed as a scalpel to lay bare the true factual controversy." Justice Brennan, *Changes in Trial Tactics*, Address before the American College of Trial Lawyers (April 1958). Rule 16.4 of the Local Rules for the District of Delaware also cautions against the element of surprise and fosters the policy of full disclosure with respect to trial issues, in that it requires the parties to submit a pretrial order that contains "[a] brief statement of what [the] plaintiff intends to provide in support of plaintiffs' claims . . ." and "[a] brief statement of what the defendant intends to prove as a defense." D. Del. Local R. 16.4(d)(8) and (9).

Nevertheless, surprise does not always warrant the granting of a new trial. Courts will grant a new trial on the basis of "surprise" only when it deprives the movant of a fair hearing. *Brady v. Chemical Constr. Corp.*, 740 F.2d 195, 200 (2d Cir. 1984). Thus, a movant must show "'reasonably genuine surprise,'" that is "'inconsistent with substantial justice[,]'" and resulted in actual prejudice. *Twigg*, 894 F.2d at 675 (citing *Air et Chaleur, S.A. v. Janeway*, 757 F.2d 489, 495 (2d Cir. 1985);

19

Fed. R. Civ. P. 61).  With these standards in mind, the court will address Tyco's contentions.

From the outset, the instant case was postured on the assertion that Tyco's Monoject Magellan devices infringed the "spring means" limitation of the patent because, after the devices are unlatched, the hinged arms move the guard toward the cannula of the needle.  Dr. Garris' expert statement, BD's summary judgment motion, and BD's pretrial memorandum in support of its claim of infringement and for damages, all make clear that the "after unlatching" theory was the only basis for Tyco's alleged infringement.  For example, Dr. Garris' expert statement explains that "[o]nce [the accused Tyco Monoject Magellan devices are] *unlatched*, the stored energy [imparted to the hinged arm by folding] is released, causing the safety guard to be urged (*i.e.,* moved) along the needle cannula toward the tip of the needle."  (D.I. 263, Ex. 4 ¶ 9) (emphasis added).  Exhibit 6 of Dr. Garris' statement, which purports to demonstrate how the Monoject Magellan SBC device literally meets each limitation of each of the asserted claims (Id. ¶ 15), also describes infringement of the "spring means" element after unlatching, and states:

> the Monoject Magellan Safety Blood Collector has spring means connected to the hinged arm that urge (move) the guard along the needle cannula toward the second position.  Though not required by the claim, in order to restrain the spring means from urging the guard forward before the desired shielding event, the Monoject Magellan Safety Blood Collector has a clip that securely maintains the shielding assembly in the first position.  Once released, the spring means urges the guard along the needle cannula toward the second position.

(D.I. 263, Expert Statement of Dr. Charles A. Garris, Jr., Ex. 6 at 4) (emphasis added).  Further, Dr. Garris testified at deposition that his infringement analysis was based on movement after unlatching.  (See D.I. 263, Ex. 5 at 117-19; 136-37; 152.)

Similarly, BD's memorandum in support of its motion for summary judgment of

infringement explains the following with regard to Tyco's Monoject Magellan devices:

> The accused products are shipped in the collapsed first position with the needle tip exposed for use by the clinician.  The hinged arm is restrained from movement by a small latch that keeps the hinged arm retracted.  The latch is required in order to ensure that the hinged arm stays folded despite the stored energy of the living hinges.  Once the latch is released, however, the living hinge springs cause the guard to move toward the second position. This fact is plainly evident from a simple review of the devices themselves and cannot be denied.

(D.I. 128, at 7.)  BD's memorandum further states that Tyco's own designer and engineer for the Magellan product "does not dispute that upon release of the latch the living hinges connected to the hinged arm move the guard along the needle cannula."  (Id. at 7-8.)  This language demonstrates that BD characterized its infringement theory as movement of the guard toward the second position after unlatching.  Indeed, the court cannot find any reference to movement of the guard prior to unlatching the hinged arm in BD's summary judgment memorandum.  Additionally, the court's summary judgment memorandum opinion characterized BD's infringement theory as post latch movement toward the second position based on its reading of BD's summary judgment memorandum.  *Becton Dickinson & Co. v. Tyco Healthcare Group*, 2004 WL 2075413, at *5 ("BD asserts that the latch is required to ensure that the hinged arm stays folded in the first position despite the stored energy of the living hinges.  Furthermore, after the latch is released, the living hinge springs cause the guard to move toward the second position.")

Furthermore, BD's pretrial memorandum in support of its claim of infringement and for damages that it submitted with the joint proposed pretrial order discusses infringement only after unlatching.  BD states that "[t]he video clips previously provided to the court by BD prove that *when the restraint is removed*, the guard moves 'toward the second position'. . . ."  (D.I. 208, Ex. 12 at 8) (emphasis added).  BD also describes the way that the living hinges of Tyco's accused devices

21

urge the guard along the cannula toward the second position, noting "[t]he hinged arm is restrained from movement by a small latch that keeps the hinged arm retracted. The latch is required in order to ensure that the hinged arm stays folded despite the stored energy of the living hinges. Once the latch is released, however, the living hinge springs cause the guard to move toward the second position." (Id. at 8 n.4.) Again, BD supports its infringement contention by citing the deposition testimony of Mark Ferguson, the designer and engineer for the Monoject Magellan devices, wherein Ferguson "does not dispute that upon release of the latch, the living hinges connected to the hinged arm move the guard along the needle cannula." (Id. at 9.)

At trial, however, Tyco argued that BD appeared to advance a different infringement theory, in addition to its original theory. According to Tyco, "BD began to argue that infringement occurred because the guards in Tyco's products move forward when the cap is removed *before* they reach the first position where the needle tip is exposed and ready for use." (D.I. 261, at 17.) Tyco, therefore, raised several objections with the court, which were discussed at sidebar and overruled in light of BD's representation that it was not raising a new infringement theory. The court also held a chambers conference during the course of trial, at which Tyco again raised its objection to BD's line of questioning. (Tr. at 743-44.) In response, the court asked BD's counsel whether he would argue that pre-latch movement of the guard satisfied the spring means limitation. (Id. at 748-49.) BD's counsel assured the court that his demonstration was only a demonstration, and that it was not a new theory of infringement (See id. at 749-59.) The court then denied Tyco's renewed objection.

During closing arguments, BD's counsel demonstrated that the guard on Tyco's product moves while the hinged arm is still latched. (Id. at 1263:19-24; 1278:18-1279:7.) However, BD's counsel barely mentioned the movement of the guard after unlatching in his closing argument.

Moreover, at some point during BD's closing argument the proverbial light bulb "went off" in the court's head, wherein the court realized that BD had in fact presented a new infringement theory to the jury.  The court then relayed its determination to counsel for both parties, stating "here is what we have Mr. Labgold.  I have now had the benefit of sitting through this evidentiary presentation and the arguments of counsel.  I am persuaded this is a new position."  (Tr. at 1363:6-17.)  Given these comments, as well as the record evidence regarding BD's infringement contentions prior to trial, the court concludes that BD advanced a new theory of infringement at trial.  The court further concludes that Tyco has demonstrated reasonably genuine surprise by BD's actions that is inconsistent with substantial justice, and resulted in actual prejudice.[7]  Accordingly, Tyco is entitled to a new trial on the issue of infringement.[8]

## IV.   CONCLUSION

For the aforementioned reasons, the court will grant a new trial on the issue of infringement with respect to the '544 patent.  In all other respects, the parties' motions are denied.


Dated: March 31 , 2006                              /s/ Gregory M. Sleet
                                                     UNITED STATES DISTRICT JUDGE

---

[7]As an illustrative example, Tyco's expert, Dr. Boyce, did not, and could not, testify about pre-latch movement because she conducted her tests only on unlatched Tyco devices, based on BD's infringement contentions that it had advanced throughout the litigation prior to trial.  Thus, Tyco was unable to present expert testimony or properly respond otherwise to BD's new infringement theory.

[8] The court has found that Tyco is entitled to a new trial because BD advanced a new infringement theory at trial, which resulted in unfair surprise and prejudice to Tyco.  As such, the court need not address Tyco's other arguments for granting it a new trial.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

BECTON DICKINSON AND COMPANY, )
                                                    )
                              Plaintiff,            )
                                                    )
v.                                                  )        Civil Action No.  02-1694 GMS
                                                    )
TYCO HEALTHCARE GROUP LP,                           )
                                                    )
                              Defendant.            )

## ORDER

For the reasons stated in the court's Memorandum of this same date, IT IS HEREBY

ORDERED that:

1.    Tyco's Renewed Motion for Judgment as a Matter of Law (D.I. 255) is DENIED.

2.    Tyco's Motion for a New Trial and/or is to Alter or Amend the Judgment (D.I. 256)
      is GRANTED.  The court shall hold a new trial on the issue of infringement with
      respect to U.S. Patent No. 5,348,544.

3.    BD's Motion for Enhanced Damages, Attorneys' Fees, Pre-Judgment Interest, and
      Post-Judgment Interest (D.I. 257) is DENIED.

4.    BD's Motion for a Permanent Injunction (D.I. 258) is DENIED.


Dated: March 31 , 2006                              /s/ Gregory M. Sleet
                                                    UNITED STATES DISTRICT JUDGE